IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


FRANCES Y. SAUNDERS,

       Plaintiff,

vs.                                                              CASE NO. 1:09-cv-164-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

       Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for disability insurance benefits.

(Doc. 1).  The Commissioner has answered (Doc. 19), and both parties have filed briefs

outlining their respective positions.  (Docs. 24 and 25.)  For the reasons discussed

below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On February 17, 2005, Plaintiff filed an application for disability benefits, alleging

a disability onset date of January 2, 2004.  Plaintiff's application was denied initially and

upon reconsideration.  (R. 44-49, 71-75.)  An Administrative Law Judge ("ALJ")

conducted Plaintiff's administrative hearing on February 5, 2007 and Plaintiff's

application was denied.  However, when Plaintiff filed suit in this Court, the

Commissioner discovered Plaintiff's administrative hearing tape was blank, and moved

pursuant to sentence six of 42 U.S.C. § 405(g) to remand Plaintiff's case for a new hearing.  (R. 390.)  A second hearing was conducted on December 10, 2010.  (R. 719-735.)

## II. FINDINGS OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of January 2, 2004 through her date last insured of September 30, 2008. The ALJ found at step two that Plaintiff had the following severe impairments: fibromyalgia and an affective mood disorder.  (R. 14.)  The ALJ found that Plaintiff's severe impairments or combination of impairments did not meet or medically equal the Commissioner's Listings.  (R. 14-15.)  The ALJ concluded that Plaintiff had the residual functional capacity to (RFC): lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit, with normal breaks, for 6 hours in an 8-hour workday; push/pull with the lower and upper extremities within the aforementioned weight restrictions; perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching; occasionally balance, stoop, crouch, kneel, and crawl.  Plaintiff should avoid hazards in the workplace due to pain and medication side effects and should avoid climbing.  Plaintiff retains the mental RFC to perform low-stress, non-production oriented work which is simple and unskilled with one, two, or three step instructions.  Plaintiff is only capable of understanding, remembering, and carrying out simple job instructions due to depression, which affects her ability to concentrate on complex or detailed tasks.  (R. 15-16.)

The ALJ concluded that Plaintiff was not capable of performing her past relevant

work as a senior research scientist.  (R. 20.)  However, the ALJ did conclude, after

hearing testimony from a vocational expert ("VE"), that jobs exist in significant numbers

in the national economy that Plaintiff can perform, such as: ticket seller, photocopy

machine operator, and weight recorder.  Accordingly, the ALJ concluded that Plaintiff

had not been under a disability at any time from her alleged onset date through her

date last insured.  (R. 21.)

## III. ISSUES PRESENTED

The issues presented by Plaintiff are whether the ALJ erred: (1) in failing to find

several additional severe impairments at step two, and (2) in not giving great weight to

the opinion of treating physician Dr. Pasem.  Plaintiff argues that as a result of these

errors, the ALJ's  assessment of Plaintiff's RFC, and finding that significant numbers of

jobs exist in the national economy which Plaintiff can perform are not supported by

substantial evidence.  (Doc. 24.)

## IV.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform

---

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive

---

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

means of introducing such evidence.[20]  Only after the Commissioner meets this burden

does the burden shift back to the claimant to show that he or she is not capable of

performing the "other work" as set forth by the Commissioner.

## V.  SUMMARY OF THE RECORD

### A.    Personal Background

Plaintiff was 43 years old at the time of the administrative hearing.  (R. 27.)  She

has a doctorate in chemistry and has past relevant work as a senior research scientist.

(R. 20, 273.)  She alleges disability due to fibromyalgia, depression, migraines, difficulty

thinking, confusion, and memory loss.  (R. 115.)

### B.  Medical Evidence of Record

Plaintiff was evaluated by psychiatrist Dr. Reddy S. Pasem, M.D., on April 16,

1997.  She had been referred by her counselor because of multisomatic complaints and

depression.  Plaintiff complained of insomnia, fatigue, migraine headaches, and

irritability.  On mental status examination, Plaintiff was cooperative, pleasant, alert, and

maintained good eye contact.  She had no speech difficulties, her thoughts were clear,

was neatly dressed, and appropriately groomed.  Plaintiff did not have any major

depressive symptoms but had criteria to meet dysthymia.  She had no difficulties with

attention or concentration, and her memory was intact.  Dr. Pasem diagnosed early

onset dysthymia and recommended medication adjustment and therapy.  (R. 319-321.)

Plaintiff next saw Dr. Pasem several years later, on May 14, 2004.  Plaintiff

complained of feeling depressed and anxious, with poor sleep, slowed thinking, and

---

[20] *See id.*

lack of energy.  Dr. Pasem noted slow movement, depressed mood, and flat affect.

Plaintiff was friendly, cooperative, had good eye contact, good concentration, good

memory, and coherent thought process.  He diagnosed major depression.

Plaintiff began regular treatment with Dr. Pasem after she returned in May 2004.

On July 20, 2004, she reported some improvement with reduction of her topamax

dose–she was feeling better, sleeping better, and able to think clearly.  Dr. Pasem

noted that Plaintiff's attitude had improved and she was not experiencing any deep

depressive symptoms.  (R. 311.)  On followup September 17, 2004, Plaintiff reported a

20-pound weight gain and trouble sleeping.  Plaintiff also complained of occasional

problems thinking and increased anxiety.  Dr. Pasem adjusted her medications and

recommended exercise.  (R. 310.)

On November 12, 2004, Plaintiff reported to Dr. Pasem that she had increased

difficulty sleeping and feeling tired.  On exam, she was cooperative with clear thought

process.  Her mood was depressed.  (R. 309.)  Plaintiff had continued complaints of low

energy and insomnia at her January 7, 2005 visit.  She also complained of pain all over.

Dr. Pasem noted that Plaintiff's attitude was positive and she was cooperative, with

intact cognition.  Her mood continued to be depressed and she had significant

situational stressors.  (R. 308.)   Less than a month later, on February 1, 2005, Plaintiff

still complained of low energy and pain.  Dr. Pasem indicated that he did "not believe

she can maintain a meaningful job."  On exam, Plaintiff was cooperative and

maintained good eye contact.  Her thought process was clear, with a depressed and

anxious mood.  (R. 307.)  On March 29, 2005, Plaintiff complained of headaches, sleep

difficulty, and low energy.  On exam, she maintained good eye contact and was positive, alert, oriented, and had clear thought process.  Her mood was sad and depressed.  She continued to be moderately obese and Dr. Pasem continued his recommendations of exercise and weight loss.  (R. 306.)

Plaintiff's chief complaint at her June 23, 2005 visit with Dr. Pasem was frequent migraine headaches.  On exam, Dr. Pasem noted that Plaintiff had gained weight.  Her speech was coherent and thought process was clear.  She had good insight but was psychomotorically slow with depressed mood.  Dr. Pasem again recommended exercise.  (R. 305.)  A September 8, 2005 treatment note indicates that Plaintiff was unable to come in for her previously scheduled appointment and was having financial difficulty.  She said that all of her medications had been very helpful.  Plaintiff complained of some stomach upset.  On exam, Plaintiff had a minimally positive attitude, clear thought process, and anxious and depressed mood.  (R. 387.)  On December 19, 2005, Plaintiff complained of stomach upset and problems with attention and concentration.  On exam, Plaintiff was cooperative and moderately obese with clear thought process and her mood was "somewhat anxious, but not severely depressed." (R. 384.)  At her next visit, Plaintiff was sleeping fairly well and her pain was under control.  Dr. Pasem expressed concern about her anti-psychotic medication without any evidence of psychosis or bipolar disorder, but Plaintiff indicated it was prescribed for pain.  On exam, Plaintiff was cooperative, clearly oriented, coherent, and maintained good eye contact.  Her mood was not severely depressed.  (R. 383.)

Plaintiff saw Dr. Pasem on June 27, 2006, after vacationing in Orlando.  She was

occasionally tutoring and gained some weight.  On exam, she had a positive attitude, good eye contact, and clear thought process.  Her mood was still depressed.  Dr. Pasem noted that Plaintiff "seems to be handling things fairly well."  (R. 379.)  Plaintiff's last visit with Dr. Pasem occurred on October 23, 2006.  Plaintiff reported that she sold her house, was tutoring, was able to do a good job, and felt proud of herself.  However, her pain was significant.  On exam, Plaintiff was pleasant, moderately obese, maintained good eye contact, and had clear thought process.  Her mood was not severely depressed.  She was clearly oriented and had good insight.  Dr. Pasem recommended continuing her medication, as she was "functioning fairly well" and followup in three months.  (R. 378.)

On March 15, 2005, licensed mental health counselor Michael Weaver wrote a letter to the Office of Disability Determinations regarding his treatment of Plaintiff since 1998.  Mr. Weaver stated that Plaintiff had a diagnosis of major depression and that other medical problems (fibromyalgia, migraine headaches, and obesity) contributed to her depression.  Plaintiff had moderate to severe psychosocial stressors in the professional, social, and financial areas.  Her ability to function independently had decreased significantly over the course of her treatment with Mr. Weaver.  He gave her a poor prognosis and a global level of adaptive functioning (GAF) of 41.  Mr. Weaver noted that Plaintiff's depression had eroded her ability to concentrate and remember things.  Her ability to work was also hindered by her physical pain from fibromyalgia. (R. 135.)  Mr. Weaver's notes from July-September 2005 indicate Plaintiff was stressed about financial issues and fear of failure.  She demonstrating difficulty focusing properly

in one session without more direction from the therapist.  (R. 322.)  Mr. Weaver's February 3, 2007 report indicated that Plaintiff's diagnosis was major depressive disorder, generalized anxiety disorder, panic attacks, mixed personality disorder with schizoid and obsessive-compulsive traits, fibromyalgia, migraines, and obesity.  (R. 374.)

Treatment notes from chiropractor John T. Hoehn indicate that Plaintiff treated with him from March 5, 2001 through April 4, 2005 for pain and stiffness in her neck and back.  Treatment included massage, spinal adjustments, and home care such as icing and stretching.  Her last treatment note indicated that her original assessment was unchanged and there had been improvement in her symptoms.  (R. 136-230.)

Treatment notes from Southeastern Rehabilitation Medicine indicate that Plaintiff treated with Dr. Anuj Sharma, D.O., from October 2003 through November 2010.  The earliest treatment note reflects rehab medicine diagnoses of chronic pain, fibromyalgia, depression, chronic narcotic usage, migraine headaches, insomnia, and ADHD.  (R. 303.)  Plaintiff saw Dr. Oscar B. DePaz on February 5, 2004, complaining of increased headaches.  Her follow-up visits were with Dr. Sharma, and Plaintiff reported persistent pain consistent with fibromyalgia, neck and low back pain, headaches, muscle spasms, tightness in her shoulder.   Dr. Sharma later added diagnoses of mechanical neck and back pain, daytime somulence, irritable bowel syndrome, cervicalgia, possible bilateral lower extremities radicular type symptoms, and chronic fatigue.  The most recent treatment narrative from Dr. Sharma, dated August 17, 2010, showed Plaintiff reporting a "good month" with pain as a 3/10.  Plaintiff reported management of her fibromyalgia

symptoms with her current workload and denied adverse affects with her medications. On exam, Plaintiff was normal overall with no acute pain behavior and normal gait and station.  (R. 489.)  Throughout her visits with Dr. Sharma, Plaintiff was functional in her activities of daily living and denied side effects from her medication.  Treatment generally consisted of medication and home exercises.  (R. 265-303, 483-647.)

Plaintiff saw treating physician Dr. Andrew Muskus, M.D., of North Florida Women's Physicians from March 9, 2004 through December 8, 2006.  Plaintiff was assessed with fibromyalgia, irregular menstrual cycles, migraines, and weight gain.  The most recent treatment note from Dr. Muskus, dated December 8, 2006, demonstrates assessments of obesity, urinary incontinence, depression, panic attacks (controlled), and improving fibromyalgia.  (R. 257-264, 375-377.)

A state agency consultant completed a physical RFC on May 4, 2005, opining that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, or sit 6 hours in an 8-hour workday; could push or pull with no limitations; and that the severity of her symptoms and effects on ADL's exceeded what would be expected based on objective findings and clinical evidence.  (R. 231-238.)

Alan J. Harris, Ph.D., a state agency consultant, completed a psychiatric review technique and mental RFC on May 16, 2005.  He noted affective (major depression) and somatoform (chronic pain) disorders.  Dr. Harris opined that Plaintiff had mild limitations in social functioning; moderate limitations in activities of daily living and maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Harris' summary conclusions in the mental RFC were that Plaintiff had moderate

limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychological symptoms, and responding appropriately to changes in the work setting.  Plaintiff had no significant limitations in any other areas.  In his functional capacity assessment, Dr. Harris opined that the medical records were not indicative of personality disorder as diagnosed by Plaintiff's counselor.  He noted that her reported activities of daily living indicated that when her pain and depression are bad, she has difficulty maintaining concentration, persistence, and pace for extended tasks.  She lacked concentration and motivation to continue to tutor complex subjects.  She was able to keep appointments with doctors and plan, but she might miss work at a regular job and struggle with coping with change.  (R. 239-256.)

Dr. Eric Puestow, M.D., state agency physician, completed a physical RFC on October 20, 2005.  He concluded that Plaintiff's allegations of pain and dysfunction exceeded the findings.  Dr. Puestow opined that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, or sit 6 hours in an 8-hour workday; and could push or pull with no limitations.  Plaintiff could never climb ladders/ropes/scaffolds and should avoid concentrated exposure to hazards.  (R. 323-330.)

State agency physician Dr. A. Alvarez-Mullin, M.D., completed a mental RFC and psychiatric review technique form on October 24, 2005.  She noted affective (major depression) and personality disorders.  Dr. Alvarez-Mullin opined that Plaintiff had mild limitations in activities of daily living and social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation.

Dr. Alvarez-Mullin's summary conclusions in the mental RFC were that Plaintiff had moderate limitations in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, and completing a normal workday and workweek without interruptions from psychological symptoms.  Plaintiff no significant limitations in any other areas.  In her functional capacity assessment, Dr. Alvarez-Mullin opined that Plaintiff's physical problems are contributing to her depression and she may have occasional difficulty with maintaining concentration and pace, mostly due to pain.  Although her psychomotor functions are occasionally sluggish, Plaintiff is capable of independent decision making. (R. 331-348.)

Dr. Pasem completed a mental RFC evaluation on December 9, 2010.  He opined that Plaintiff had *mild* limitations in the ability to: interact appropriately with the general public and ask simple questions or request assistance; *moderate* limitations in the ability to: understand and remember very short and simple instructions, get along with others without distractions, maintain socially appropriate behavior and basic standards of neatness and cleanliness, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; *marked* limitations in the ability to: remember locations and work-like procedures, understand and remember detailed instructions, sustain an ordinary routine, accept instructions and respond appropriately to criticism from others, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions; and *extreme* limitations in the ability to: carry out very short and simple instructions, carry

out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain customary attendance, be punctual, work near others without being distracted, make simple work-related decisions, complete a normal workday and week without interruptions and without an unreasonable number of rest periods.

Dr. Pasem included a note at the end of the mental RFC noting Plaintiff's longstanding depression, medical problems, and multiple medications.  He opined that she suffered from mild/moderate deficits in concentration and had constant fatigue.  (R. 678-680.)

### C.   <u>Hearing Testimony</u>

Plaintiff was 43 years old at the time of the administrative hearing on December 10, 2010.   She testified that she completed her Ph.D. in chemistry and has been single since her divorce in 1989.  (R. 723.)   At the time of her alleged onset date in January 2004, she had been trying to run her own business as a tutor.  She tutored individuals, small groups, and large groups.  She did not have the time or energy to conduct the business.  Prior to that, she was averaging 30-35 hours per week.  At the time she stopped in 2004, she was averaging less than 15 hours of work per week.  Plaintiff testified she had difficulty putting together outlines of the chemistry problems and solutions she would cover during each session.  (R. 724.)  She would be late to her sessions because she did not have the handouts ready on time.  This happened during about half of her sessions.  Plaintiff testified she also has problems completing things in a timely manner in every day life, such as paying her bills on time.  (R. 725.)  When

asked about Dr. Pasem's February 2005 note that Plaintiff had chronic depression with an inability to function, Plaintiff testified that at the time her life "had been completely turned upside down" and she could no longer do the activities she once enjoyed, such as sports and church activities.  She lost her job and some of her friends.  (R. 726.) She testified that she currently felt "somewhat better" but is still very limited and has gained 100 pounds.  She has the same obstacles but doesn't feel "horrible all the time."

Plaintiff testified that since 2004, she has had fatigue and usually cannot start an activity before noon.  (R. 727.)   She needs time in the morning to wake up, take her medication, and then lie down and wait for them to take effect so she can feel well enough to start moving around.  Plaintiff testified that she has difficulty remembering things, even familiar things, such as someone's name, and will stop and stare while doing a task because it feels "insurmountable."

Plaintiff testified that she currently tutors 15 hours or less each week because she has no other source of income.  (R. 728.)   She likes to work for a maximum of four hours in a day.  (R. 729.)   If she works too much, she gets migraines and fatigue. Plaintiff testified that her muscles will become tense and sore and she will find it more difficult to think while she is tutoring.  (R. 730.)

Vocational expert (VE) Jane Beougher also testified at the hearing.  (R. 730.) The ALJ asked the VE to assume hypothetical individual with the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit, with normal breaks, for 6 hours in an 8-hour workday; push/pull with the lower and upper extremities within the aforementioned weight restrictions; to perform activities requiring bilateral manual

dexterity for both gross and fine manipulation with handling and reaching; occasionally balance, stoop, crouch, kneel, and crawl. The individual should avoid hazards in the workplace due to pain and medication side effects and should avoid climbing.  The individual retains the mental RFC to perform low-stress, non-production oriented work which is simple and unskilled with one, two, or three step instructions.  She is only capable of understanding, remembering, and carrying out simple job instructions due to depression, which affects her ability to concentrate on complex or detailed tasks.  (R. 731-32.)  The VE opined that the individual could perform the light, unskilled positions of ticket seller, photocopy machine operator, and weight recorder.   When asked to assume that the hypothetical individual had no useful ability to function or carry out simple or detailed instructions, perform activities, maintain attention and concentration, work with others without being distracted, or to make simple work-related decisions, the VE testified that the individual could not do the jobs previously described.  (R. 733.)

## VI.  DISCUSSION

The issues presented by Plaintiff are whether the ALJ erred: (1) in failing to find several additional severe impairments at step two, and (2) in not giving great weight to the opinion of treating physician Dr. Pasem.  Plaintiff argues that as a result of these errors, the ALJ's  assessment of Plaintiff's residual functional capacity ("RFC"), and finding that significant numbers of jobs exist in the national economy which Plaintiff can perform are not supported by substantial evidence.  (Doc. 24.)

### Severity of Impairments

Plaintiff argues that the ALJ erred at step two of the sequential evaluation by not

finding that Plaintiff had the following severe impairments in addition to fibromyalgia and affective mood disorder: "major depression, chronic insomnia; fibromyalgia; chronic pain; obesity; premenstrual dysphoric disorder; chronic (prescribed) narcotic usage; migraine headaches; insomnia; ADHA [sic]; mechanical neck and back pain; daytime somnolence; irritable bowel syndrome; cervicalgia; possible bilateral lower extremeties [sic] radicular type symptoms; and chronic fatigue."  (Doc. 24, p. 1.)

The Eleventh Circuit, as have numerous other circuits, has held that step two of the sequential analysis may do no more than screen out de minimis claims.[21]  An impairment or combination of impairments is severe at step two of the sequential evaluation if it significantly limits one's physical or mental ability to do basic work activities.[22]  To be considered "severe"  a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[23]

The ALJ is not required to identify all of the impairments that should be considered severe.  *See Heatly v. Commissioner of Social Sec.,* 382 F. App'x 823 (11th Cir. 2010) (finding harmless error where the ALJ determined the claimant's only severe impairment was status-post cervical fusion, despite a separate diagnosis of back pain). The only requirement at step two is to identify if any severe impairment exists.  *Id.* ("Nothing requires that the ALJ must identify, at step two, all of the impairments that

---

[21]  Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987); see also Anthony v. Sullivan, 954 F.2d 289, 294-95 (5th Cir. 1992); Bailey v. Sullivan, 885 F.2d 52, 56-57 (3rd Cir. 1989).

[22] 20 C.F.R. § 404.1520(c).

[23] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

should be considered severe.").  Here, the ALJ determined at step two that Plaintiff suffered from the severe impairments of fibromyalgia and affective mood disorder, a finding sufficient to satisfy step two.[24]  It is also clear that the ALJ considered all of Plaintiff's impairments in combination, having discussed in detail Plaintiff's testimony and medical history, which includes her complaints of pain, insomnia, difficulty concentrating, fatigue, headaches, and occasional stomach discomfort; her limitations due to these symptoms; and the diagnoses documented by her treating physicians.

The Court finds no error in the ALJ's step two finding.  The ALJ found two severe impairments suffered by the Plaintiff and went on to consider all of her impairments and symptoms at the later steps.

**Weight Afforded to Treating Physician's Opinion**

Plaintiff argues that the ALJ improperly assigned "some weight" to treating psychiatrist Dr. Pasem's 2010 mental RFC of Plaintiff, wherein he opined that Plaintiff had marked and extreme limitations in most functional areas.  (R. 678-80.)  Plaintiff argues that had the ALJ afforded great weight to Dr. Pasem's mental RFC, the ALJ's RFC and the VE's testimony would differ and result in a finding that Plaintiff is disabled.

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the

---

[24] Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)("[w]hether or not it [the impairment] qualifies as a disability and whether or not it results from a single severe impairment ... is enough to satisfy the requirement of step two."); Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987).

ALJ must give it controlling weight.[25]  Nevertheless, the ALJ may discount the treating

physician's opinion if good cause exists to do so.[26]  Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a contrary finding,"

the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight,"

the opinion is "inconsistent with [the treating physician's] own medical records," the

statement "contains no [supporting] clinical data or information," the opinion "is

unsubstantiated by any clinical or laboratory findings," or the opinion "is not

accompanied by objective medical evidence."[27]  If an ALJ rejects a treating physician's

opinion, he must give explicit, adequate reasons for so doing, and failure to do so

results in the opinion being deemed accepted as true as a matter of law.[28]

The ALJ partially rejected the mental RFC of Dr. Pasem because, among other

reasons, his treatment records do not support his assessment that Plaintiff suffers from

extreme and marked limitations in most areas of functioning.  At Plaintiff's last visit with

Dr. Pasem, on exam she was pleasant, maintained good eye contact, and had clear

thought process.  Her mood was not severely depressed.  She was clearly oriented and

had good insight.  Dr. Pasem recommended continuing her medication, as she was

"functioning fairly well" and followup in three months.  (R. 378.)  This assessment is

---

[25] 20 C.F.R. § 404.1527(d)(2).

[26] Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).

[27]  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

[28] MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

consistent with most of Dr. Pasem's treatment notes over the course of his treatment of Plaintiff and is at odds with Dr. Pasem's mental residual functional capacity assessment and particularly Dr. Pasem's opinion that Plaintiff was extremely limited in the ability to carry out short, simple and detailed instructions.

For example, Dr. Pasem's progress notes disclose that at Plaintiff's May 14, 2004 visit, Plaintiff had good concentration and good memory.  On July 20, 2004, Dr. Pasem noted that Plaintiff's attitude had improved and she was not experiencing any deep depressive symptoms.  (R. 311.)  At her January 7, 2005 visit, Dr. Pasem noted that Plaintiff's attitude was positive and she was cooperative with intact cognition.  (R. 308.)  On February 1, 2005, Dr. Pasem indicated that he did "not believe she can maintain a meaningful job."  On exam, Plaintiff was cooperative and maintained good eye contact.  Her thought process was clear, with a depressed and anxious mood.  (R. 307.)  On March 29, 2005, Plaintiff complained of headaches, sleep difficulty, and low energy.  On exam she maintained good eye contact and was positive, alert, oriented, and had clear thought process; her mood was sad and depressed.  On June 23, 2005, Dr. Pasem noted that Plaintiff's speech was coherent, thought process clear, and insight good, but she was psychomotorically slow with depressed mood.  (R. 305.)  A September 8, 2005 treatment note indicates that Plaintiff had a minimally positive attitude, clear thought process, and anxious and depressed mood.  (R. 387.)  On December 19, 2005, Plaintiff's exam indicated she had clear thought process and her mood was "somewhat anxious, but not severely depressed."  (R. 384.)  At her next visit, on exam Plaintiff was cooperative, clearly oriented, coherent, and maintained good eye

contact.  Her mood was not severely depressed.  (R. 383.)  On June 27, 2006, Dr. Pasem found on exam that Plaintiff had a positive attitude, good eye contact, clear thought process, and depressed mood.  Dr. Pasem noted that Plaintiff "seems to be handling things fairly well."  (R. 379.)

In addition to the fact that Dr. Pasem's own treatment notes are at odds with the extreme limitations in his report, the ALJ also found significant that there are no restrictions contained in any of the treatment notes of Plaintiff's treating doctors. As discussed above, Dr. Pasem was one of Plaintiff's treating doctors, and his progress notes do not contain findings supporting the extreme limitations in his report.

The two state agency medical consultants provided similar mental RFC assessments of Plaintiff, neither finding more than moderate limitations.  (R. 253-256, 331-334.)

Moreover, the ALJ also pointed out that at the hearing Plaintiff was able to give detailed narrative answers to the ALJ's questions, related well to the ALJ, and answered questions appropriately.  (R. 723-730.)  While the ALJ is not a medical expert and therefore cannot substitute his judgment for that of a medical doctor, the ALJ nonetheless, is entitled to include in his assessment his personal observations.

Lastly, the ALJ reviewed and relied upon Plaintiff's activities of daily living, which disclose an ability to do much more than the extreme limitations found by Dr. Pasem. In addition to being fully capable of operating a motor vehicle, performing her personal needs and using a computer, the ALJ found significant that the Plaintiff was able to perform part-time tutoring work, a task that requires greater functionality than the

extreme limitations included in Dr. Pasem's assessment.

For these reasons, there is substantial evidence supporting the ALJ's decision to afford less than substantial weight to Dr. Pasem's mental RFC evaluation.  The ALJ examined and evaluated the medical records for evidence supporting Dr. Pasem's assessment of the severity of Plaintiff's mental limitations.  Based upon the Court's review of the ALJ's decision and the objective medical evidence of record, the Court concludes that the ALJ did not err in only according "some weight" to Dr. Pasem's mental RFC.

As substantial evidence supports the ALJ's conclusions regarding Plaintiff's severe impairments and weight assigned to Dr. Pasem's mental RFC,  it is unnecessary to address Plaintiff's arguments that the ALJ erred in determining Plaintiff's RFC at step four and not including additional limitations in the hypothetical to the VE.

## VII.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida this 1ˢᵗ  day of March 2012.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**